829 P.2d 330

**PEOPLE OF FAITH, INC., an Arizona non-profit corporation, Plaintiff–Appellant, Cross–Appellee,**

**v.**

**ARIZONA DEPARTMENT OF REVE-NUE, an agency of the State of Arizona, Defendant–Appellee, Cross–Appellant.**

**No. 1 CA–TX 91–001.**

Court of Appeals of Arizona, Division 1, Department T.

March 31, 1992.

Jennings, Strouss & Salmon by Ann M. Dumenil, James M. Ackerman and J. Matthew Powell, Phoenix, for plaintiff-appellant, cross-appellee.

Grant Woods, Atty. Gen. by William D. Hostetler, Asst. Atty. Gen., Phoenix, for defendant-appellee, cross-appellant.

## OPINION

EHRLICH, Presiding Judge.

People of Faith ("taxpayer") appeals from summary judgment denying its claim for a refund of use taxes assessed on purchases of personal property used to construct buildings and facilities at the taxpayer's Royal Oaks Life Care Center that are not part of its Royal Oaks Health Care Center. It also appeals from summary judgment declining to refund penalties assessed against it pursuant to former Ariz. Rev.Stat.Ann. ("A.R.S.") § 42–1416 on amounts not paid when due before July 1, 1986. The Arizona Department of Revenue ("DOR") cross-appeals from the judgment to the extent it refunded penalties assessed against the taxpayer for amounts that became delinquent after July 1, 1986. The following issues thus are raised:

(1) Whether the taxpayer was entitled to claim the use tax exemption provided by Arizona Administrative Code ("A.A.C.") Rule R15–5–2320(B) for "licensed nursing care and residential care institutions ..." for purchases made in connection with the construction of those portions of the Royal Oak Life Care Center that are not part of the taxpayer's licensed nursing care institution;

(2) whether DOR's issuance of letters to the taxpayer approving its applications for exemption from the use tax law during the years included in the audit precluded DOR from assessing unpaid use taxes against the taxpayer for those years;

(3) whether the tax court erred in declining to refund penalties assessed against the taxpayer under former A.R.S. § 42–1416 for amounts not paid when due before July 1, 1986; and

(4) whether the tax court erred in abating late payment penalties assessed against the taxpayer pursuant to A.R.S. § 42–136(D) for amounts delinquent after July 1, 1986.

## FACTS AND PROCEDURAL HISTORY

At all relevant times, the taxpayer was an Arizona non-profit corporation exempt from federal and Arizona income taxes. During the audit period of December 1, 1982, through July 31, 1986, the taxpayer constructed and began to operate a Sun City complex known as Royal Oaks Life Care Center ("Royal Oaks"). Royal Oaks consists of a 100–bed nursing care institution ("health care center") licensed by the Arizona Department of Health Services ("DHS"), a 249–unit residential complex and 100 garden homes. The entire facility, including the health care center, is used to provide a continuum of medical, nursing and health-related services to the holders of its life care contracts.

The taxpayer held a permit issued by the Arizona Department of Insurance pursuant to A.R.S. § 20–1801 et seq. authorizing it to enter into "life care contracts" with members of the public for lifetime care at Royal Oaks.[1] The purpose of life care services is to allow older persons to live independently and in their own residences for as long as possible. To be accepted as a resident of a Royal Oaks apartment or garden home under a life care contract, a person must provide a physician's statement of good health and be able to live in a residence without assistance. Once accepted, a life care contract holder is entitled to receive lifetime health care and be admitted to the health care center when necessary without additional charge. The life care contract contemplates a progression from when a resident can live independently to a time of complete dependence on Royal Oaks personnel.

If a resident of an apartment or a garden home loses the ability to be self-sufficient within the range of the taxpayer's supportive services, that person is transferred to the health care center, although only upon a physician's order. The health care center is inspected and licensed by DHS as a nursing care institution providing skilled nursing care. It is composed of six private rooms and 47 semi-private rooms with two nursing stations. It also has a therapy room, medical examination room, dental/podiatry examination room, separate dining rooms for patients who can feed themselves and for those who need help to eat, and administrative and maintenance areas. There are no nursing units at Royal Oaks outside the health care center, and although Royal Oaks maintenance personnel work throughout the campus, the health care center has its own administrative staff.

Some Royal Oaks residents never use the health care center; many are admitted to the health care center for a brief time and then return to the residential units. However, if a resident is permanently transferred to the health care center, that residence may be made available to another person. If the individual then recovers sufficiently to resume unassisted living, another residence is provided if and when available. About 20 Royal Oaks residents remain permanently in the health care center.

---

1. A "life care contract" is defined by A.R.S. § 20–1801(6) as "a contract to provide to a person for the duration of such person's life or for a term in excess of one year nursing services, medical services or health-related services, as defined in § 36–401, in addition to board and lodging for such person in a facility, conditioned upon the transfer of an entrance fee to the provider of such services in addition to or in lieu of the payment of regular periodic charges for the care and services involved."

There are significant differences between the health care center and the remainder of the life care community. The health care center is open to non-residents of Royal Oaks, while the apartments and garden homes are occupied only by holders of life care contracts. As a result, when Royal Oaks personnel refer to the health care center, they are discussing only the nursing facility, referring to those persons, who in fact wear hospital wristbands, as "patients." In contrast, those who occupy the apartments and garden homes are referred to as "residents" and are not counted in the patient census required by Arizona law. *See* A.A.C. Rule R9–10–917(C)(2)(a).

Illustrative of their independence, all Royal Oaks apartments and garden homes have parking. Most of the residences accommodate a washer and a dryer, and independent laundry facilities are available. However, hallways have handrails, and bathrooms and showers have grab-bars to assist residents. Emergency pull cords in each bathroom and bedroom are connected to a lightboard in the health care center; a resident can pull the cord and a light for that unit will go on at the health care center nursing station. A nurse and an assistant then will go to the unit to assist the resident.

The Royal Oaks residential complex includes a fully-equipped exercise room, the use of which a nurse practitioner may prescribe. The taxpayer further offers exercise programs for residents who have health-related problems. Residents confined to wheelchairs are given assistance and two wheelchair vans are provided to transport such residents.

Royal Oaks has a dining room for its residents; there is a charge for meals. A licensed dietitian plans meals and appropriate diets, e.g., diabetic or low-cholesterol. Other facilities include a beauty shop, a library, a putting green and a snack bar. Every week, Royal Oaks personnel do flat linen laundry for residents, and every other week, they clean each apartment and home.

The complex also consists of an adult day care center separate from the health care center. It is intended to prevent premature nursing home placement of residents and to provide a respite for the well spouse or care-giver. Open five days a week, it is used by 25 to 30 residents.

The taxpayer additionally maintains a separate health clinic for Royal Oaks residents open four mornings a week and staffed by a nurse. The nurse also makes visits to residents' apartments and garden homes and dispenses prescribed medications when necessary. In conjunction with this, a social worker is available to assess the mental health and well-being of Royal Oaks residents and to perform counseling.

The taxpayer also employs five nursing assistants exclusively assigned to attend to the needs of residents outside the health care center. They are able to assist residents in getting in and out of bed, bathing, dressing or changing colostomy bags. At the request of a resident's doctor, a nurse practitioner or nursing assistant may prepare a resident for a hospital stay.

The entire facility is inspected by the Department of Insurance, but the taxpayer never has attempted to qualify its residential units for licensure by DHS. Royal Oaks residential units have never qualified for a skilled nursing care facility license and are not licensed by DHS to provide either skilled nursing care or supervisory care.

During the audit period, from December 1, 1982, through July 31, 1986, the taxpayer annually applied for and received DOR approval of a "hospital exemption" from transaction privilege and use taxes. Each year, DOR gave its approval to the taxpayer through a standard form letter. The standard provisions of these letters, which did not vary significantly over the four-year audit period, were as follows:

Re: Hospital Exemption

Gentlemen:

Your application for exemption under the Transaction Privilege (Sales) Tax and Use Tax Law has been considered and approved for the 1983 calendar year.

All sales of tangible personal property made to your institution under the following classifications are therefore not subject to either Transaction Privilege (Sales) Tax or Use Tax provided that the property purchased is to be consumed in this state to carry on the regular purposes of your institution:

Utilities Code 4

Publishing Code 5

Printing Code 10

Restaurants and Bars Code 11

Rental of Personal Property Code 14

Retail Code 17

Because this exemption is subject to annual review to ascertain any changes in your activity which may affect exempt status, an application for next year must be received in writing by December 1. Such application must include a copy of your license to operate as a hospital, nursing care institution, or residential care institution providing medical, nursing, or health-related services.

As the Department of Revenue does not issue exemption numbers for this purpose you may wish to provide your suppliers with a copy of this letter.

During the construction of the Royal Oaks complex, the taxpayer authorized its contractor, Mardian Construction Company, to purchase all construction materials as its agent. The construction company used the taxpayer's exemption letters to avoid paying retail transaction privilege taxes on the purchase of all construction materials, including those incorporated into portions of the complex other than the licensed nursing care institution.

After an audit, DOR assessed $524,-032.69 in unpaid use taxes, $52,403.27 as a late payment penalty and $185,154.16 in interest. The taxpayer exhausted its administrative remedies, paid the assessment under protest and brought the instant action against DOR in the tax court. On cross-motions for summary judgment, the tax court held in favor of DOR.[2] It reasoned:

The regulation [A.A.C. Rule R15–5–2320(B)], in relevant part, provides that "purchases made by licensed nursing care and residential care institutions, the primary usage of which is to provide medical services, nursing services, or health related services, ... are also exempt (from application of the use tax)."

The Court holds that the term "licensed nursing care and residential care institutions" limits the exemption to those health care institutions which have a license pursuant to Article 1, Chapter 4, Title 36 of the Arizona Revised Statutes. The Court further holds that, because of this interpretation by the Court, the taxpayer is not entitled to exemption from the use tax for materials purchased other than those purchased for use in the construction of the portion of its life care center which is a licensed nursing care facility.

The taxpayer also has objected to the assessment of penalties by [DOR] because of the tax which it has failed to pay. It claims relief from the application of the penalty by virtue of A.R.S. § 42–136(D), which became effective July 1, 1986. Previously, penalties were governed by former A.R.S. § 42–1416, which reads as follows. "Any person failing to pay the tax imposed by this article within the time prescribed shall pay, in addition thereto, a penalty of 10%."

The Court interprets A.R.S. § 42–1416 to impose the penalty of 10% upon failure to pay the tax when due.

Therefore, the Court holds that any tax due before July 1, 1986, carries the penalty, simply because it was not paid on time.

A.R.S. § 42–136(D), effective July 1, 1986, prescribed a penalty just as does former A.R.S. § 42–1416 except that it excuses application of the penalty if it is shown that failure to pay the tax is due

2. In a preliminary ruling, the tax court granted partial summary judgment for DOR, holding that purchases made within Arizona were subject to Arizona use tax. *People of Faith Inc. v. Arizona Department of Revenue*, 161 Ariz. 514, 779 P.2d 829 (Tax 1989). This court later dismissed the taxpayer's attempted appeal from this ruling for lack of jurisdiction. *People of Faith Inc. v. Arizona Department of Revenue*, 164 Ariz. 102, 791 P.2d 369 (App.1990).

to reasonable cause and not willful neglect. The Court finds A.R.S. § 42–136(D) to be somewhat ambiguous in that it seems to provide two not identical standards for application of the penalty, or for excusing it. Penalty statutes are to be construed strictly against the taxing authority. The Court finds that the failure to pay the tax on the part of the taxpayer was not due to reasonable cause, but the Court cannot find that such lack of reasonable cause rises to the level of willful neglect.

The Court, therefore, holds that no penalty can be imposed upon any tax due after the effective date of A.R.S. § 42–136.

After denying the taxpayer's motion for reconsideration, the tax court entered formal judgment in accordance with its rulings and the taxpayer timely appealed. DOR timely cross-appealed from the portion of judgment that declined to impose late-payment penalties on the taxpayer for June and July 1986. We have jurisdiction pursuant to A.R.S. § 12–2101(B) and (F)(1).[3]

## TAXPAYER'S CLAIM OF EXEMPTION FROM USE TAXATION ON PURCHASES OF MATERIALS INCORPORATED INTO PORTIONS OF ROYAL OAKS OTHER THAN THE HEALTH CARE CENTER

### The Taxpayer's Contentions

The taxpayer contends that A.A.C. Rule R15–5–2320(B), which exempts from use taxation "purchases made by licensed nursing care and residential care institutions ...," extends the exemption to those portions of the Royal Oaks facility outside the health care center which allegedly constitute a "residential care institution" within the meaning of former A.R.S. § 36–401(26) (now subsection (32)). As a first alternative, it claims that if the exemption extends only to "licensed residential care institutions," its Department of Insurance permit authorizing it to enter life care contracts at

Royal Oaks renders the part of its facility outside the health care center a "licensed residential care institution." As a second alternative, it alleges that if a DHS license is required, the entire Royal Oaks facility has such a license by virtue of the DHS license granted its health care center, an integral part of the entire facility.

The taxpayer further contends that former A.R.S. § 42–1317(A)(5) reflects a legislative policy to exempt all purchases by nonprofit "residential care facilities" from transaction privilege and use taxation. It claims that the provision of A.A.C. Rule R15–5–2320(B) that a licensed residential care institution qualifies for the use tax exemption only if it is used "primarily" for providing health-related services is invalid as beyond the scope of the governing statute.

The taxpayer argues that, although A.R.S. § 36–405(A) requires the DHS director to promulgate regulations for the licensing of all "health care institutions," of which a residential care institution is a class, no residential care institutions are actually licensed by DHS. It thus urges that the DHS director's failure to do so cannot be allowed to render the statutory use tax exemption unavailable to it.

The taxpayer insists that DOR has allowed other similarly-situated taxpayers to assert the "licensed residential care institution" exemption and that it would violate the taxpayer's right to equal protection to deny this exemption to it. Finally, the taxpayer claims that in view of DOR's series of annual letters approving its application for a "hospital exemption," DOR's contention that the taxpayer is not entitled to the "licensed residential care institution" exemption must be applied only prospectively.

### The Applicable Statutes and Regulations

Former A.R.S. § 42–1317(A)(5) (1985) exempted the following from the Arizona transaction privilege (sales) tax:

---

**3.** This matter is assigned to Department T of this court pursuant to A.R.S. §§ 12–120.04(G)

and 12–170(C).

All personal property purchased or leased in this state by any licensed hospital organized and operated exclusively for charitable purposes, no part of the net earnings of which inures to the benefit of any private shareholder or individual, or *any licensed nursing care institution or licensed residential care institution* or kidney dialysis center *which provides medical services, nursing services or health-related services and not used or held for profit*.... [Emphasis added.][4]

Former A.R.S. § 42–1409,[5] which specified the exemptions available during the audit period under the complementary Arizona use tax, contained no corresponding exemption. Both sides agree, however, that under the rule of *Halliburton Oil Well Cementing Co. v. Reily*, 373 U.S. 64, 83 S.Ct. 1201, 10 L.Ed.2d 202 (1963), Arizona was required to provide an exemption of identical scope under its use tax law. DOR recognizes this through A.A.C. Rule R15–5–2320(B), which exempts from use taxation all "purchases made by licensed nursing care and residential care institutions, the primary usage of which is to provide ... health related services."

There is no dispute in this case that the taxpayer's health care center is a "licensed nursing care institution" and that all purchases of personal property made for its use were and are exempt from use taxation. The only question posed by this appeal is whether the remainder of the Royal Oaks facility constitutes a "licensed residential care institution" also entitled to an exemption from use taxation.

The licensure of health care institutions is governed by A.R.S. § 36–401 *et seq.* The statutory definition of "residential care institution" was added to A.R.S. § 36–401 by 1973 Ariz.Sess.Laws ch. 158, § 69.[6] Subsection 20 defined "residential care institution" as "a health care institution other than a hospital or a nursing care institution which provides resident beds and health-related services for persons who do not need in-patient nursing care." At the time it was amended in 1973, former A.R.S. § 36–401(10) defined "health care institution" as "every place, institution, building or agency, whether organized for profit or not, which provides facilities with medical services, nursing services or health-related services." 1973 Ariz.Sess.Laws ch. 158, § 69. Former subsection 11 defined "health-related services" as "services, other than medical, pertaining to general supervision, protective, preventive and personal care services." *Id.*

The enactment creating DHS in 1973 delegated substantial power to its director to regulate and license health care institutions. A.R.S. § 36–405. It was amended in minor respects in 1977 to provide:

A. The director shall adopt, repeal and amend reasonable rules and regulations which shall establish minimum standards and requirements for the construction, modification and licensure of health care institutions necessary to assure the public health, safety and welfare. The standards and requirements shall relate to

---

**4.** Former A.R.S. § 42–1317 (1985) was repealed by 1988 Ariz.Sess.Laws ch. 161, § 1, effective June 30, 1989.

**5.** This statute was amended to specifically exempt licensed residential care institutions. A.R.S. § 42–1409(A)(11)(c).

**6.** Section 69 of 1973 Ariz.Sess.Laws ch. 158, does not reflect the definition of "residential care institution" as an addition to the pre-existing text of A.R.S. § 36–401, but instead represents it as already being a part of that section. This is an inaccuracy in the session laws. The 1973 *Journal of the Arizona House of Representatives* reflects that on March 29, 1973, the entire text of House Bill 2004 as originally introduced was stricken and a new text was substituted for it. The new text comprehensively amended title

36, A.R.S., and at the same time created DHS. The substituted text is set forth verbatim at pages 594 through 905 of the *Journal.* Section 68 at 680–82 of the *Journal* contains a version of A.R.S. § 36–401 that includes no definition of "residential care institution." After the House of Representatives refused to concur in certain amendments added by the Arizona Senate, *see* 1973 *House Journal* at 1325–47, 1373, a Free Joint Conference Committee of the House and Senate adopted a compromise version. 1973 *House Journal* at 1604–43. The definition of "residential care institution" appears for the first time as subsection 20 of A.R.S. § 36–401 in this version. *See* 1973 *House Journal* at 1618–20.

the construction, equipment, sanitation, staffing for medical, nursing and personal care services, and record keeping pertaining to the administration of medical, nursing and personal care services, in accordance with generally accepted practices of health care. The director shall use the current standards adopted by the joint commission on accreditation of hospitals and the commission on accreditation of the American osteopathic association, as guidelines in prescribing minimum standards and requirements under this section.

B. The director shall, by regulation, establish a health care institution classification for nursing care institutions, with subclassifications including, but not limited to, skilled nursing facilities, intermediate care facilities and personal care facilities. Such regulations shall provide for the number, type and scope of nursing services, other supportive services and standards of patient care required for each subclass of institution.

C. The director may, by regulation, classify and subclassify health care institutions according to character, size, range of services provided, medical or dental specialty offered, duration of care and standard of patient care required for the purposes of licensure. Classes of health care institutions may include but not be limited to hospitals, infirmaries, outpatient treatment centers, health screening services centers and residential care facilities. Whenever the director reasonably deems distinctions in regulations and standards to be appropriate among different classes or subclasses of health care institutions the director may make such distinctions.

1977 Ariz.Sess.Laws ch. 55, § 2; 171, § 11; 172, § 6.[7] The general outlines of the DHS director's regulatory and licensing authority over health care institutions remained the same through the DOR audit with which this litigation is concerned.

The tax exemption that is the subject of this litigation first was enacted in 1977.

Section 18 of 1977 Ariz.Sess.Laws ch. 172, amended former A.R.S. § 42–1321(A)(5) to provide as follows:

A. This article shall not apply to:

\* \* \* \* \* \*

5. All personal property purchased in this state by any LICENSED hospital organized and operated exclusively for charitable purposes, no part of the net earnings of which inures to the benefit of any private shareholder or individual, or ANY LICENSED NURSING CARE INSTITUTION OR LICENSED RESIDENTIAL CARE INSTITUTION WHICH PROVIDES MEDICAL SERVICES, NURSING SERVICES OR HEALTH RELATED SERVICES AND NOT USED OR HELD FOR PROFIT OR ANY LICENSED HOSPITAL, LICENSED NURSING CARE INSTITUTION OR LICENSED RESIDENTIAL CARE INSTITUTION operated by the state or any political subdivision of this state. [Capitalization indicates language added by amendment.]

The same act also amended A.R.S. § 36–401 to include as subsection 17 a definition of "nursing care institution" as "a health care institution providing in-patient beds or resident beds and nursing services to persons who need nursing services on a continuing basis but who do not require hospital care or direct daily care from a physician." 1977 Ariz.Sess.Laws ch. 172, § 4. The following definitions then were inserted:

(25) "Supervisory care home" means a residential care institution, which provides only supervisory care services to more than five ambulatory persons unrelated to the administrator or owner of such home.

(26) "Supervisory care services" means accommodation, board and general supervision, including assistance to persons in the self-administration of prescribed medications.

---

7. Amended, 1978 Ariz.Sess.Laws ch. 62, §§ 1, 23 ("[C]hapter 172 version is amended to incorporate the amendments made by chapters 55 and 171 and the chapter 55 and chapter 171 versions are repealed.").

*Id.* Finally, the same act incorporated as subsection 12 "supervisory care services" within the existing definition of "health-related services." *Id.*

Pursuant to A.R.S. § 36–405, the DHS director has promulgated the rules contained in title 9 of the Arizona Administrative Code, chapter 10, entitled "Department of Health Services—Health Care Institutions: Licensure." One rule classifies and subclassifies health care institutions. The hospital and nursing care institution classifications have three subclassifications each and the outpatient treatment center classification has four subclassifications. A.A.C. Rule R9–10–114(A)(1), (2) and (3). The residential care institutions classification has only one subclassification—supervisory care homes. A.A.C. Rule R9–10–114(A)(4).

Rule R9–10–611 *et seq.* set forth licensure requirements and operating rules for supervisory care homes. There are no DHS rules governing "residential care institutions" as such. Rule R9–10–114(B) provides: "Any facilities that are clearly health care institutions but do not come within any of the subclasses listed in Subsection (A) shall at a minimum meet the requirements of R9–10–115." Rule R9–10–115 comprehends eight general requirements that do not include DHS licensure.

*Applicability of "Licensed Residential Care Institution" Exemption to Royal Oaks Facility*

■ The taxpayer interprets Rule R15–5–2320(B), which exempts all "purchases made by licensed nursing care and residential care institutions ...," as requiring a license to exempt only the nursing care portion of Royal Oaks and not the residential care portion. We do not agree. The most natural reading of the rule's language is that the adjective "licensed" applies to both nursing care institutions and residential care institutions. This interpretation accords best with former A.R.S.

§ 42–1317(A)(5), which separately extended the sales tax exemption to "licensed nursing care institution[s]" and to "licensed residential care institution[s]." No authority has been cited or found for the proposition that DOR would have been empowered to broaden the use tax exemption administratively beyond that specifically provided in the statute. Accordingly, the taxpayer was entitled to the exemption only if those portions of its Royal Oaks facility other than the health care center constituted a "licensed residential care institution" within the meaning of former A.R.S. § 42–1317(A)(5).[8]

■ The core of the taxpayer's analysis on appeal is its argument that even though the residential care facility was not licensed as a residential care institution by DHS, it constituted a "licensed residential care institution" within former A.R.S. § 42–1317(A)(5) and Rule R15–5–2320(B) because it was "licensed" by the Department of Insurance under A.R.S. § 20–1801 *et seq.* as a life care provider. Again we disagree.

■ The general rule is that every interpretation is against exemptions from taxation statutes. *Ebasco Services v. Arizona State Tax Comm'n,* 105 Ariz. 94, 99, 459 P.2d 719, 724 (1969). Former A.R.S. § 42–1317(A)(5) extended the exemption in question only to "licensed residential care institutions." The definition of "residential care institution" is found only in A.R.S. § 36–401, the cornerstone of the chapter dealing with the regulation and licensure of "health care institutions." Although A.R.S. § 36–401 does not define the term "licensed," at all relevant times, A.R.S. § 36–405(A) clearly indicated what the legislature meant by "licensure" of "health care institutions":

> The director [of DHS] shall adopt, repeal and amend reasonable rules and regulations which shall establish minimum standards and requirements for the con-

---

**8.** DOR argues that the Royal Oaks residential care facility does not qualify as a "licensed residential care institution" because it did not provide "resident beds" and therefore did not meet the definition of "residential care institution" within former A.R.S. § 36–401(26). As the taxpayer points out, however, DOR did not argue before the tax court that the residential care facility did not meet the statutory definition of "residential care institution." We therefore do not reach that issue on appeal.

struction, modification and *licensure* of health care institutions necessary to assure the public health, safety and welfare. *The standards and requirements shall relate to the construction, equipment, sanitation, staffing for medical, nursing and personal care services, and record keeping pertaining to the administration of medical, nursing and personal care services, in accordance with generally accepted practices of health care.* [Emphasis added.]

The rules promulgated by the DHS director in chapter 10, title 9 of the Arizona Administrative Code set forth extensive licensure and other standards on the subject matters contemplated by A.R.S. § 36–405(A). *E.g.,* A.A.C. Rule R9–10–611 *et seq.* (governing licensure and operating standards for supervisory care homes).

A "permit" issued by the Department of Insurance pursuant to A.R.S. § 20–1801 *et seq.* to a life care contract provider falls far short of constituting its holder a "licensed residential care institution" within former A.R.S. § 42–1317(A)(5). The statutory scheme set forth in A.R.S. § 20–1801 *et seq.* originally was adopted in the same enactment first creating the "licensed residential care institution" exemption the taxpayer claims in this case. 1977 Ariz.Sess. Laws ch. 172, § 2 (adopting A.R.S. §§ 20–1801 through 20–1811); § 18 (amending former A.R.S. § 42–1321(A)(5) to add "licensed residential care institution" exemption from transaction privilege taxation). If the legislature had intended to extend the new tax exemption to all holders of life care contract permits under new A.R.S. § 20–1801 *et seq.,* it logically would have done so in the 1977 legislation, either expressly or by using congruent language in §§ 20–1801 *et seq.* and 42–1321.

Instead, it drafted its new life care contract regulation provisions not as a "licensing" system for life care facilities parallel to that contemplated by A.R.S. § 36–401 *et seq.* for health care institutions, but rather as a mandatory procedure for the issuance of "permits" by the Department of Insurance upon the public disclosure and filing of specified financial information and operating cost estimates. Contrary to the tax-payer's argument, the Department of Insurance does not effectively "license" life care providers to render medical services, nursing care services or health-related services. The Department of Insurance is authorized only to issue a narrow "permit" enabling a person or company already legally entitled to provide such services to enter contracts to do so for longer than a year at a particular facility for an "entrance fee" in lieu of or in addition to periodic charges. A.R.S. §§ 20–1801, 20–1802.

To be entitled to a permit under A.R.S. § 20–1801 *et seq.,* an applicant need only submit to the Department of Insurance an application disclosing information listed in A.R.S. § 20–1802(B)(1)–(18). This information is aimed primarily at revealing the true financial condition of the applicant and its facility and the applicant's projected financial condition for five years into the future as shown by a feasibility study. Once issued by the Department, the applicant's "permit" does not "license" the applicant's facility itself. It merely is evidence that the applicant has provided the financial information required by the statute and is authorized to engage in the business of selling the unique variety of insurance coverage embodied in life care contracts. *See* A.R.S. § 20–1802(G).

Indeed, as A.R.S. § 20–1812 (added in 1983) makes clear, the life care provider's "permit" does not signify confirmation or certification by the Department of Insurance that the provider's life care facility meets any particular standards or requirements related to health care. *Cf.* A.R.S. § 36–405(A). Rather, A.R.S. § 20–1812 requires life care providers to deliver to the persons with whom they enter into life care contracts a disclosure document stating in bold-faced print: "A permit for this life care facility has been issued by the Arizona department of insurance. This permit does not constitute approval, recommendation or endorsement of the life care facility by the department, nor does it evidence the accuracy or completeness of the information in this statement."

Finally, in enacting A.R.S. § 20–1801 *et seq.*, the legislature recognized the difference between a "permit" to enter life care contracts and a "license" to operate a health care institution. A prospective permit-holder's application is required by A.R.S. § 20–1802(B)(11) to contain:

> A statement as to whether the applicant, a promoter, a principal, a parent or subsidiary corporation or an affiliate has had any injunctive or restrictive order of a court of record, or any suspension or revocation of any state or federal license or permit, arising out of or relating to business activity of health care applied against it, *including without limitation actions affecting a license to operate a foster care facility, a health care institution, a retirement home or a home for the aged.* [Emphasis added.]

In our opinion, the tax court correctly held that the use tax exemption sought by the taxpayer extended only to health care institutions licensed pursuant to A.R.S. § 36–401 *et seq.* and that "the taxpayer is not entitled to exemption from the use tax for materials purchased other than those purchased for use in the construction of the portion of its life care center which is a licensed nursing care facility."

■ The taxpayer nevertheless argues that its residential care facility met all of the statutory characteristics of a "licensed residential care institution" within A.R.S. § 36–401 *et seq.* and that it must therefore be treated as such for tax purposes. It contends:

> [N]o DHS-licensed residential care institutions exist in Arizona because DHS, contrary to its statutory mandate, has not yet adopted licensing procedures for such facilities. Obviously, the lethargy of an administrative department cannot repeal a tax exemption enacted by the Arizona Legislature.

We reject the taxpayer's premises and its conclusion. In its opening brief, the taxpayer states: "The Arizona Legislature required that DHS '*shall* adopt ... reasonable rules and regulations which shall establish minimum standards and requirements for the ... licensure of health care

institutions.' A.R.S. § 36–405(A) (emphasis added)." In its reply brief, it asserts:

> [DOR] argues that "there is nothing requiring" DHS to license residential care institutions. [Citation to brief omitted.] This contention is flatly contrary to the statute:
>
> > The Director [of DHS] *shall adopt* ... reasonable rules and regulations for the ... licensure of *health care institutions.*
>
> A.R.S. § 36–405(A) (emphasis added). The statute uses the mandatory word "shall" in directing DHS to adopt licensing procedures for health care institutions.

Both of these statements, however, truncate the first sentence of A.R.S. § 36–405(A), the full text of which is as follows: "The director shall adopt, repeal and amend reasonable rules and regulations which shall establish minimum standards and requirements for the construction, modification and licensure of health care institutions *necessary to assure the public health, safety and welfare.*" (Emphasis added.)

The omitted language belies the view promoted by the taxpayer that A.R.S. § 36–405(A) imposes an unqualified requirement on the DHS director to provide by rule for the licensure of every conceivable kind of health care institution. The full text makes clear that the director's only obligation is to promulgate regulations for licensing "health care institutions," the licensure of which he deems "necessary to assure the public health, safety and welfare." He thus has discretion not to provide for licensing of health care institutions that need not be licensed to obtain this goal.

Former A.R.S. § 36–405(C) confirms this interpretation. It provided:

> The director may, by regulation, classify and subclassify other health care institutions according to character, size, range of services provided, medical or dental specialty offered, duration of care and standard of patient care required for the purposes of licensure. Classes of health care institutions may include but not be

limited to hospitals, infirmaries, outpatient treatment centers, health screening services centers and residential care facilities. *Whenever the director reasonably deems distinctions in regulations and standards to be appropriate among different classes or subclasses of health care institutions the director may make such distinctions.* [Emphasis added.] [9]

Contrary to the taxpayer's argument, nothing required the DHS director to provide for the licensure of every facility meeting the statutory definitions of "health care institution" or "residential care institution."

The taxpayer also is in error in asserting that no DHS-licensed residential care institutions exist in Arizona. A "supervisory care home" is currently the only subclassification of "residential care institution" and, indeed, it is defined as "a residential care institution which provides only supervisory care services to more than five ambulatory persons unrelated to the administrator or owner of such home." Former A.R.S. § 36–401(A)(30) (now subsection (36)); A.A.C. Rule R9–10–114(A)(4). The DHS director has promulgated extensive regulations for the licensure and operation of such institutions. A.A.C. Rules R9–10–611 through R9–10–624.

It may well be true, as the taxpayer asserts, that there exists a variety of residential care institutions other than supervisory care homes. Nevertheless, supervisory care homes are the only kind of residential care institution that the DHS director has exercised discretion to license and regulate under A.R.S. § 36–405(A). We agree with DOR that the DHS director evidently has determined that, among all the institutions and facilities that meet the general definition of "residential care institution," only supervisory care homes provide health-related services at a sufficiently complex or sophisticated level to require DHS licensure.

9. The word "other" in the first sentence was a reference to now-repealed former subsection B which required the director to establish "a health care institution classification for nursing

The taxpayer concedes that Royal Oaks does not provide "supervisory care" and acknowledges that the Royal Oaks residential care facility does not fit within the category of facilities that offer "supervisory care services." In our opinion, the taxpayer's Royal Oaks residential care facility did not constitute a "licensed residential care institution" within the meaning of former A.R.S. § 42–1317(A)(5) and was not entitled to the use tax exemption provided in A.A.C. Rule R15–5–2320(B).

Because we determine that the taxpayer's residential care facility did not constitute a "licensed residential care institution" at all, we need not address the taxpayer's argument that A.A.C. Rule R15–5–2320(B) improperly narrowed the statutory exemption to those licensed residential care institutions "the primary usage of which is to provide ... health related services...."

### Constitutionality of Use Tax Assessment Against Taxpayer

■ The taxpayer moved for reconsideration in the tax court on the basis that Pacific Living Centers, the operator of a similar life care facility, received blanket use tax exemptions over a period of years. Citing *Gosnell Development Corp. v. Arizona Department of Revenue*, 154 Ariz. 539, 744 P.2d 451 (App.1987), it argues that for DOR "to now deny People of Faith the same exemption it allowed other similarly situated taxpayers is unconstitutional."

We disagree. The facts in *Gosnell Development* were unique. In that case, DOR acquiesced in an anomalous trial court ruling on remand from a prior appeal by the taxpayer's competitor that had the effect of arbitrarily denying the benefits of the appellate court's ruling to some taxpayers, but not others. The court stated:

Under well-settled Arizona and federal law, taxing authorities treating taxpayers in the same class differently, as Gosnell has been treated, violate their rights to equal protection under the law. [Cita-

care institutions, with subclassifications including, but not limited to, skilled nursing facilities, intermediate care facilities, and personal care facilities." *See* 1989 Ariz.Sess.Laws ch. 255, § 2.

tions omitted.] Similarly, "[t]axing authorities may not single out some taxpayers for selective enforcement of tax laws that apply equally to all similarly situated taxpayers." [Citation omitted.] *Id.* at 541, 744 P.2d at 453. However, the court specifically qualified its holding as follows:

If this were a case of the Department's failing to collect taxes by oversight or negligence or some similar conduct, we do not believe a case could be made that such conduct results in unequal treatment. Here, however, we have a blanket policy of the Department's excusing all contractors, except those who have been so unfortunate as to have paid the correct taxes.

*Id.*

Unlike the situation in *Gosnell Development,* the taxpayer here is not the victim of a blanket discriminatory policy of DOR. As Royal Oaks itself admitted in the tax court, DOR also has audited Pacific Living Centers and assessed use taxes on its purchases for the residential care portion of its facility. The fact that DOR happened to audit Royal Oaks before it audited Pacific Living Centers, and consequently assessed use taxes for a correspondingly earlier period of time, is evidence of no more than "oversight or negligence or similar conduct" and does not amount to a violation of Royal Oaks' right to equal protection.

## WHETHER THE DEPARTMENT OF REVENUE'S INTERPRETATION OF THE EXEMPTION APPLIES PROSPECTIVELY

█ The taxpayer argues that in view of DOR's practice of issuing "hospital exemption" letters to it for the tax years included in the audit period, DOR's disallowance of a use tax exemption claim on the purchases for its residential care facility must only be applied prospectively. It cites *Southern Pacific Co. v. Cochise County,* 92 Ariz. 395, 377 P.2d 770 (1963), for the proposition that when a change in the administrative interpretation of a taxing act results in economic hardship, the new interpretation should apply only prospectively. It argues

the "years of good faith reliance on [DOR's] annual approval of its exemption application" and the difficulty of having to come up with a substantial amount in back taxes, interest and penalties. Then, in response to DOR's assertion that DOR never actually interpreted the claimed exemption until it audited the taxpayer, the taxpayer further asserts:

There is no question that before the audit, [DOR] considered applications for and expressly granted authority to claim the exemption to residential care institutions, like Royal Oaks, licensed only by the Department of Insurance. It granted that authority even when an applicant, such as Pacific Living Centers, specifically stated in the application that its residential facility was covered only by the Department of Insurance permit. Exemptions were granted on this basis and were relied upon by taxpayers. [Record citations omitted.]

We cannot agree that the record in this case reveals circumstances that require as a matter of fairness that DOR's denial of a use tax exemption for the taxpayer's residential care facility be applied only prospectively. It is true that the taxpayer's competitor, Pacific Living Centers, specifically apprised DOR in its exemption applications that its Retirement Village was licensed by the Department of Insurance and that Pacific Living Centers received exemption letters on that basis. Absent from the record, however, is any indication that the taxpayer called to the tax court's attention evidence that it had made any similar disclosures in connection with its own applications for exemption. Indeed, one of the taxpayer's employees submitted an affidavit in connection with the taxpayer's motion for partial summary judgment, stating:

In not reporting any taxable transactions to [DOR] or paying any use tax to [DOR] during the period of time ... which is included in the period covered by [DOR's] sales and use tax audit of People of Faith, the assessment of use tax, interest, and penalties with respect to which is before the Arizona Tax Court in Case Docket No. TX 89–00001, *People of*

*·Faith, in good faith, relied on* the Arizona transaction privilege and use tax statutes, [DOR's] sales and use tax regulations, and *[DOR's] annual sales and use tax exemption letters provided to People of Faith with respect to the operation of Royal Oaks as a "licensed nursing care institution."* [Emphasis added.]

A second employee affidavit is substantively the same.

Because the Royal Oaks facility comprehended a "licensed nursing care institution," the purchases for which undisputedly were exempt from use taxation, DOR's issuance of "hospital exemption" letters to "People of Faith" or "Royal Oaks" during the audit period with respect to operation as a "licensed nursing care institution" would not by itself have tended to mislead the taxpayer into believing that all of its purchases, including those for its 349 residences and associated facilities, were equally exempt. Further, the exemption letters themselves required annual submission of a copy of "your license to operate as a hospital, nursing care institution, or residential care institution providing medical, nursing, or health-related services." We find no arguable equitable grounds for limiting the disallowance of the taxpayer's claimed exemption to prospective application only.

## THE TAX COURT'S RULING ON STATUTORY PENALTIES—APPEAL AND CROSS-APPEAL

Through June 30, 1986, A.R.S. § 42–1416 provided for use tax delinquency penalties as follows:

Any person failing to pay the tax imposed by this article within the time prescribed shall pay, in addition thereto, a penalty of ten per cent, plus interest at the rate determined pursuant to section 43–805 from the date on which the tax becomes due.

Effective July 1, 1986, A.R.S. § 42–1416 was repealed and replaced by A.R.S. § 42–136. 1985 Ariz.Sess.Laws ch. 366, §§ 1, 13, 90. Subsection D of A.R.S. § 42–136 provides in pertinent part:

A person who fails to pay the tax within the time prescribed shall pay a penalty of ten per cent in addition to the tax, unless it is shown that the failure is due to reasonable cause and not due to wilful neglect.

The tax court held that A.R.S. § 42–1416 imposed a penalty simply because the tax was not paid on time and therefore declined to abate penalties assessed by DOR on use taxes due from the taxpayer before July 1, 1986. The tax court also found that A.R.S. § 42–136(D) appeared to provide two different standards for applying or excusing the penalty, stating: "The Court finds that the failure to pay the tax on the part of the taxpayer was not due to reasonable cause, but the Court cannot find that such lack of reasonable cause rises to the level of wilful neglect." The court therefore abated the penalties assessed by DOR on taxes due after July 1, 1986.

On appeal, the taxpayer cites *General Petroleum Corp. of California v. Smith,* 62 Ariz. 239, 157 P.2d 356 (1945), for the proposition that tax penalties imposed under penalty statutes absolute in their terms nevertheless may be abated upon a showing of reasonable cause. The taxpayer further claims that a "reasonable cause" exception to former A.R.S. § 42–1416 is required as a matter of constitutional law, citing *Halliburton Oil Well Cementing Co.* It argues in addition that, in view of DOR's abatement of penalties assessed against Pacific Living Centers, the failure to abate the penalties against it violated its right to equal protection. The taxpayer urges that, under the circumstances of this case, it had reasonable cause to believe that it was entitled to the use tax exemption for its entire facility and that the tax court erred in refusing to abate all late payment penalties against it.

We disagree. Even assuming that a "reasonable cause" exception to the penalty provision of former A.R.S. § 42–1416 is required, the tax court did not abuse its discretion in determining that no reasonable cause existed for the taxpayer's failure to pay the full use taxes due in this case. Although the taxpayer's reliance on

its life care provider permit from the Department of Insurance is sufficiently rational to escape classification as frivolous, it did not rise to the level of "reasonable cause" for concluding in the first instance that no use tax could be owed on the taxpayer's purchases for its residential care facility and that none should be returned or paid.

■ We also reject the taxpayer's contention that DOR's abatement of penalties assessed against Pacific Living Centers renders its refusal to do the same for the taxpayer a violation of its right to equal protection. As we observed above, the record indicates that Pacific Living Centers disclosed to DOR that it was relying on its life care provider permit from the Department of Insurance in applying for use tax exemption of the purchases made for its residential care facility. However, it contains no indication that the taxpayer made a similar disclosure in applying for its own use tax exemption. Further, the record indicates that the penalties assessed against Pacific Living Centers were waived pursuant to former A.R.S. § 42–139.02(A), which provided:

> The director shall abate the full amount of any penalties which are directly attributable to erroneous written advice furnished to the taxpayer by an employee of [DOR] acting in his official capacity in response to a specific request from the taxpayer, unless the penalties are the result of the taxpayer's failure to provide adequate or accurate information.

This statute did not become effective until August 1986, after the end of the taxpayer's audit period, and the record does not reflect that the taxpayer sought or was eligible for an abatement under that statute. *See* 1986 Ariz.Sess.Laws ch. 402, § 1. No violation of the taxpayer's right to equal protection appears from this record.

■ We finally consider DOR's cross-appeal from that portion of the tax court's judgment that abated penalties assessed against the taxpayer for use taxes that became due after July 1, 1986. As DOR points out, the language of A.R.S. § 42–136(D) that assesses a penalty for failure

to timely pay the tax "unless it is shown that the failure is due to reasonable cause and not due to wilful neglect" is identical to language contained in 26 U.S.C. § 6651(a)(1). The United States Supreme Court has interpreted the federal language as follows: "To escape the penalty, the taxpayer bears the heavy burden of proving both (1) that the failure did not result from 'willful neglect,' and (2) that the failure was 'due to reasonable cause.'" *United States v. Boyle,* 469 U.S. 241, 245, 105 S.Ct. 687, 689–90, 83 L.Ed.2d 622 (1985).

In our opinion, both the plain language of A.R.S. § 42–136(D) and the United States Supreme Court's interpretation of identical federal language require the conclusion that a taxpayer may not avoid the penalty without demonstrating both that the failure to pay was due to reasonable cause and that it did not result from willful neglect. We already have sustained the tax court's determination that the taxpayer had no reasonable cause for its failure to pay. We therefore reverse the tax court's decision to abate the penalties assessed for taxes due after July 1, 1986.

## CONCLUSION

For the reasons expressed in this opinion, we affirm the tax court's judgment to the extent that it determined that the taxpayer was liable for use taxes over the audit period assessed on its purchases of goods for incorporation into those portions of the Royal Oaks facility other than the licensed nursing care institution. We also affirm that portion of the judgment that declined to abate the penalties assessed against the taxpayer for taxes due before July 1, 1986. However, we reverse that portion of judgment that abated the penalties assessed against the taxpayer for use taxes due from and after July 1, 1986.

Affirmed in part; reversed in part; remanded for proceedings consistent with this opinion.

CONTRERAS and LEVI RAY HAIRE (Retired), JJ., concur.

NOTE: The Honorable LEVI RAY HAIRE was authorized to participate in this case by the Chief Justice of the Arizona Supreme Court pursuant to Ariz. Const. art. VI, § 20.