851 P.2d 869

**SONITROL OF MARICOPA COUNTY, INC.**

v.

**CITY OF PHOENIX.**

**CSG SECURITY SERVICES, INC.**

v.

**CITY OF PHOENIX.**

**No. TX 91–00106.**

Tax Court of Arizona.

April 26, 1993.

Warner Angle Roper & Hallam P.C. by Larry C. Schafer, John A. Buric, Phoenix, for plaintiffs.

Phoenix City Atty., by Sandra K. McGee, Phoenix, for defendant.

## OPINION

SCHAFER, Judge.

This case was brought by Taxpayers Sonitrol of Maricopa County and CSG Security Services, Inc. to recover privilege taxes imposed on their income from monitoring security alarm systems. The Taxpayers sell, install, service, and monitor security alarm systems for customers in Phoenix and other areas of the state in both commercial and residential buildings. Both Taxpayers monitor their customers' alarm systems from stations in Phoenix. When an alarm system is triggered, a signal is transmitted on a telephone line to one of the stations. The station then contacts the appropriate authorities.

The Taxpayers charge their customers for the service of having an operator available to respond to emergencies (monitoring). They do not charge for the transmission of the signal when the alarm is triggered.

The City of Phoenix audited Sonitrol for the period of April, 1987 through October, 1989 and CSG for the period of April, 1987 through June, 1989. The City determined that the Taxpayers owed privilege taxes on the gross income received from monitoring the security alarm systems in Phoenix and the City assessed the Taxpayers pursuant to Phoenix City Code § 14–470. That section provides in pertinent part:

*Telecommunication services.*

(a) The tax rate shall be at an amount equal to two and seven tenths percent (2.7%) of the gross income from the business activity upon every person engaging or continuing in the business of providing telecommunication services to consumers within this City.

(1) Telecommunication services shall include:

(A) two-way voice, sound, and/or video communication over a communications channel.

(B) one-way voice, sound, and/or video transmission or relay over a communications channel.

(C) facsimile transmissions.

(D) providing relay or repeater service.

(E) providing computer interface services over a communications channel.

(F) time-sharing activities with a computer accomplished through the use of a communications channel.

(2) Gross income from the business activity of providing telecommunication services to consumers within this City shall include:

(A) all fees for connection to a telecommunication system.

(B) toll charges, charges for transmissions, and charges for other telecommunications services; provided that such charges relate to transmissions originating in the City and terminating in this State.

(C) fees charged for access to or subscription to or membership in a telecommunication system or network.

(D) charges for monitoring services relating to a security or burglar alarm system located within the City where such system transmits or receives signals or data over a communications channel....

(c) *Interstate transmissions.* Charges by a provider of telecommunication services for transmissions originating in the City and terminating outside the State are exempt from the tax imposed by this Section.

In essence, Phoenix City Code § 14–470 imposes a privilege tax on a business's gross income derived from providing telecommunication services to consumers within the City of Phoenix. "Telecommunication services" are defined by § 14–470(a)(1) as voice, sound or video communications or transmissions over a communication chan-

nel. Taxpayers transmit over a communication channel.

■ "Gross income," pursuant to § 14–470(a)(2), is income from fees for connecting to a communication system, charges for transmissions, and charges for monitoring services. Thus, the income Taxpayers received from monitoring security alarm systems located in Phoenix is gross income under § 14–470.

Taxpayers do not dispute that their gross income is taxable under § 14–470(a). Their dispute is with § 14–470(c)—an exemption for transmissions originating in Phoenix and terminating outside Arizona. They argue: (1) the exemption violates their right to equal protection because it classifies similarly situated taxpayers differently; (2) the tax imposed under § 14–470 has been applied by the City in an unconstitutionally discriminatory manner; and (3) the exemption is unconstitutionally vague. To remedy these ills, they maintain that the taxes they paid on their monitoring activities must be refunded. The parties filed cross-motions for summary judgment. The Court grants summary judgment to the City of Phoenix.

### Does § 14–470(c) Unconstitutionally Discriminate Between Similarly Situated Taxpayers?

Taxpayers argue that Phoenix City Code § 14–470(c) violates their right to equal protection because it creates an exemption based upon the location of the business's monitoring station. § 14–470(c) states:

> *Interstate transmissions.* Charges by a provider of telecommunication services for transmissions originating in the City and terminating outside the State are exempt from the tax imposed by this Section.

This, the Taxpayers maintain, exempts any monitoring station located outside Arizona because the signals from its customers originate in Phoenix but end up outside of Arizona. On the other hand, if the business's monitoring station is in Arizona, the charges for monitoring services are not exempt because its customers' signals originate and end in Arizona.

■ A privilege tax that classifies taxpayers for purposes of taxation is unconstitutional if the classification is arbitrary or unreasonable. *Flagstaff Vending Co. v. City of Flagstaff*, 118 Ariz. 556, 578 P.2d 985 (1978); *State v. Levy's*, 119 Ariz. 191, 580 P.2d 329 (1978); *Arizona State Tax Comm'n v. Lawrence Mfg Co.*, 15 Ariz. App. 486, 489 P.2d 860 (App.1971). But the Court finds it unnecessary to decide whether the classification in § 14–470(c) is arbitrary or unreasonable because it does not apply to Taxpayers. They misread that subsection. It states that *"charges ... for transmissions"* are exempt if the transmission originates in Phoenix and terminates outside Arizona. It does not mention charges for monitoring services, and "charges for transmissions" and "charges for monitoring services" are two separate and distinct items of "gross income" under § 14–470(a)(2). If the City had intended subsection (c) to apply to monitoring services, it would have said so. Instead, the City specifically limited the exemption to "charges for transmissions."

■ In interpreting a statute, the court will first examine the language to be interpreted. If that language expresses a clear and unequivocal standard, the court will interpret the statute accordingly. It will look no further for guidance. *Escalanti v. Superior Court*, 165 Ariz. 385, 388, 799 P.2d 5, 8 (App.1990); *Rio Rico Properties, Inc. v. Santa Cruz County*, 172 Ariz. 80, 89, 834 P.2d 166, 175 (Tax 1992). The language of § 14–470(c) is clear—charges for transmissions are exempt from the tax imposed by § 14–470 if the transmission originates in the city and terminates outside the state; charges for monitoring services are not exempt.

■ These Taxpayers do not charge for the transmission of alarm signals. They charge for monitoring services and were taxed on the gross income received from those services. Taxpayers are correct that the subsection (c) exemption distinguishes between transmissions that terminate instate and those that terminate out of state. But only businesses that charge for trans-

missions have standing to challenge that classification. *State v. Powers*, 117 Ariz. 220, 225, 571 P.2d 1016, 1021 (1977); *State Tax Comm'n v. Board of Supervisors*, 43 Ariz. 156, 170, 29 P.2d 733, 739 (1934). Because Taxpayers do not charge for transmissions, they have no ground to complain of unequal treatment.

### Has § 14–470 Been Discriminatorily Enforced?

■ Taxpayers claim that the City of Phoenix enforced the tax imposed by Phoenix City Code § 14–470 in a discriminatory manner, in violation of their right to equal protection under the state and federal constitutions. To establish their claim they must prove that the City systematically and deliberately discriminated against them. *Duhame v. State Tax Comm'n*, 65 Ariz. 268, 282, 179 P.2d 252, 261 (1947); *Tucson Mechanical Contracting, Inc. v. Arizona Dep't of Revenue*, 175 Ariz. 176, 854 P.2d 1162 (App.1992). The Court holds that the facts do not show systematic and deliberate discrimination.

The tax imposed by § 14–470 became effective on April 1, 1987. From that time until late 1988, the City was lax in its enforcement of § 14–470. This appears to have been due to negligent inaction and, as to the out of state businesses, the City's belief that the exemption in subsection (c) applied to any alarm system business with an out of state monitoring station.

In late 1988, the City mounted an effort to assess and collect the § 14–470 taxes it had not enforced for almost two years. The City audited Taxpayers' books and assessed taxes for their monitoring services. The Taxpayers appealed the assessments. As a result of that administrative appeal, the City determined that its previous interpretation of subsection (c) was wrong and on June 20, 1990, announced that the subsection (c) exemption only applies to charges for transmissions; charges for monitoring services are taxable whether a business's monitoring station is located inside or outside the state, and that has been the City's policy ever since.

Since 1990, the City has made an effort to go back to the years 1987, 1988, and 1989 and assess taxes against those businesses with monitoring stations in or out of state that monitor alarm services for Arizona customers. It has either contacted businesses with records outside the state by telephone or placed them on an audit plan. As of May, 1992, the City had conducted four audits or desk reviews of businesses whose records are located outside the state and another audit was then in progress.

Phoenix City Code § 14–550 sets forth the time period in which the City may retrospectively assess a tax. That section allows the City to assess additional tax within four years after the month a return is required to be filed. Thus, the City apparently had the authority when it changed its policy in June of 1990 to retrospectively assess taxes required by § 14–470 back to April 1, 1987, the date that tax went into effect. In other words, the City could have collected all taxes owed for monitoring services that were exempted by the City's prior policy.

This is not intentional and systematic discrimination against the Taxpayers. The Taxpayers actually benefitted from the City's inaction from 1987 to 1989 because they did not pay the tax. Once the City discarded its lethargy and settled upon what it believed to be a correct interpretation of § 14–470(c), it began an effort to recoup its losses; the Taxpayers happen to be two of the businesses that benefitted from the lethargy and now, like all the others, must pay what is rightfully owing. If what the City did during 1987–1990 can be called discrimination, it is not the type of discrimination from which the Taxpayers may benefit.

In this regard the facts and some of the language in *Gosnell Dev. Corp. v. Arizona Dep't of Revenue*, 154 Ariz. 539, 744 P.2d 451 (App.1987) are instructive. In that case, the Department of Revenue had a blanket policy that excused all contractors during a certain period of time from using the correct method to compute their tax liability. As a result, taxpayers who com-

puted their liability correctly paid higher taxes. The court stated:

> If this were a case of the Department's failing to collect taxes by oversight or negligence or some similar conduct, we do not believe a case could be made that such conduct results in unequal treatment. Here, however, we have a blanket policy of the Department's excusing all contractors, except those who had been so unfortunate as to have paid the correct taxes.

*Gosnell,* 154 Ariz. at 541, 744 P.2d at 453.

The court in *Gosnell* held that the actions of the Department violated Gosnell's right to equal protection and entitled Gosnell to a refund. However, the court suggested that if after discovery of the discrimination, a taxing authority were able to collect additional taxes from the favored taxpayers, no grounds for unequal treatment would exist. The court in *Gosnell* quoted from *Iowa–Des Moines Nat'l Bank v. Bennett,* 284 U.S. 239, 247, 52 S.Ct. 133, 136, 76 L.Ed. 265, 273 (1931):

> It may be assumed that all ground for a claim for refund would have fallen if the State, promptly upon discovery of the discrimination, had removed it by collecting the additional taxes from the favored competitors. By such collection the petitioners' grievances would have been redressed; for these are not primarily overassessment. *The right invoked is that to equal treatment; and such treatment will be attained if either their competitors' taxes are increased or their own reduced.*

*Gosnell,* 154 Ariz. at 541, 744 P.2d at 453.

In this case, Taxpayers' equal protection claim fails because the City promptly began to remove the discrimination when it discovered it. When the City changed its policy in 1990, it had the authority to retrospectively collect all taxes imposed by § 14–470 that had been erroneously exempted. Had the relevant statute of limitations cut off the City's ability to collect such taxes, the Court would be faced with a different issue.

It is important to recognize that the privilege tax imposed by § 14–470 is a self-assessed tax. Taxpayers determine their tax liability and submit their payments to the City on a monthly, quarterly, or annual basis. The City is authorized to conduct audits to determine whether taxpayers are paying the correct tax. Phoenix City Code, ch. 14, art. 5.

The Arizona Court of Appeals recently discussed a taxing authority's obligation to collect self-assessed taxes. In *Tucson Mechanical Contracting v. Arizona Dep't of Revenue,* 175 Ariz. 176, 854 P.2d 1162 (App.1992), the court stated that the Department of Revenue is not statutorily charged with auditing and enforcing transaction privilege tax payments against all prospective taxpayers. The court suggested that taxing authorities must be selective in using their limited enforcement resources. In that case, the court found that the Department of Revenue's decision to select some taxpayers for audit and not others did not violate Tucson Mechanical's right to equal protection because there was no evidence showing the Department's manner of selecting taxpayers for audit relied upon inherently invidious standards.

### Is § 14–470 Unconstitutionally Vague?

Taxpayers final claim is that the exemption in Phoenix City Code § 14–470(c) is unconstitutionally vague and thus violates their right to due process of law. A statute is unconstitutionally vague when it is "so vague that men of common intelligence must guess at its meaning and differ as to its application.... [T]he statutory language must be sufficiently definite so that those who are to execute the law may do so in a rational and reasoned manner." *Cohen v. State,* 121 Ariz. 6, 9, 588 P.2d 299, 302 (1978).

■ Taxpayers argue the § 14–470(c) exemption is unconstitutionally vague because one cannot tell whether it applies only to charges for transmissions or includes charges for monitoring services. They point out that even the City had trouble interpreting the provision.

 

The Court finds no vagueness. The language of subsection (c) is clear; if a business charges for transmissions and those transmissions originate within the city and terminate outside the state, then those charges are exempt from the tax imposed by § 14–470. Charges for monitoring services are not exempt.

The Court holds that Taxpayers' constitutional claims fail. Summary judgment is granted to the City of Phoenix.