891 P.2d 880

**SONITROL OF MARICOPA COUNTY, an Arizona corporation, Appellant,**

**v.**

**CITY OF PHOENIX, a municipal corporation, Appellee.**

**No. 1 CA–TX 92–0015.**

Court of Appeals of Arizona, Division 1, Department T.

Aug. 11, 1994.

Review Denied March 21, 1995.

Warner, Angle, Roper & Hallam, P.C. by Larry C. Schafer, John A. Buric, Phoenix, for appellant.

Roderick G. McDougall, City Atty. by Sandra K. McGee, Asst. City Atty., Phoenix, for appellee.

## OPINION

GRANT, Presiding Judge.

Taxpayer Sonitrol of Maricopa County, Inc., ("Sonitrol") appeals from summary judgment denying its claim for a refund of some $40,082.55 in City of Phoenix privilege license taxes assessed pursuant to Phoenix City Code section 14–470 (taxing "the business of providing telecommunications services to consumers within this City"), effective April 1, 1987. The appeal raises these issues:

(1) whether this court should vacate the tax court's opinion, filed while this appeal was in the briefing process;

(2) whether Phoenix's telecommunications tax is unconstitutional as written because it taxes revenues of in-state security alarm monitoring services and exempts revenues of out-of-state security alarm monitoring services;

(3) whether the City of Phoenix is applying the telecommunications tax in violation of the federal and state equal protection clauses; and

(4) assuming the telecommunications tax is unconstitutional as written or as applied, whether Sonitrol is entitled to a refund.

We have jurisdiction pursuant to Ariz.Rev. Stat.Ann. ("A.R.S.") section 12–2101(B).[1]

### FACTS AND PROCEDURAL HISTORY

Sonitrol is an Arizona corporation that does business in Maricopa County. Sonitrol sells, installs, services and monitors residential and commercial security alarm systems.

Sonitrol monitors security alarm systems for customers located in Phoenix and other areas of Arizona. Its central monitoring station is located in Phoenix. Sonitrol monitors alarm systems over dedicated and ordinary telephone lines. When its monitoring station receives a signal from an alarm that has been triggered, the appropriate authorities are contacted. Security alarm monitoring services whose central monitoring stations are outside Arizona monitor their customers' locations in the same way as those who monitor from within Arizona. The only difference is the location where alarm signals are received.

Sonitrol charges its monitoring service customers for providing an operator to respond to emergencies seven days a week, twenty-four hours a day. Sonitrol does not in fact charge its customers for alarm signals transmitted when alarms are activated, nor for long distance costs.

Before April 1, 1987, the City of Phoenix's privilege license tax on the business of providing telecommunications services did not apply to the business of monitoring security alarms. Effective April 1, 1987, the city adopted a version of the Arizona Model City Tax Code, including a new telecommunications privilege license tax. Phoenix City Code § 14–470. Section 14–470 provides in pertinent part:

(a) The tax rate shall be at an amount equal to two and seven tenths percent (2.7%) of the gross income from the business activity upon every person engaging or continuing in the business of providing telecommunication services to consumers within this City.

(1) Telecommunication services shall include:

(A) two-way voice, sound, and/or video communication over a communications channel.

(B) one-way voice, sound, and/or video transmission or relay over a communications channel.

(C) facsimile transmissions.

---

1. The appeal is assigned to Department T of this court pursuant to A.R.S. sections 12–120.04(G) and 12–170.

(D) providing relay or repeater service.

(E) providing computer interface services over a communications channel.

(F) time-sharing activities with a computer accomplished through the use of a communications channel.

(2) Gross income from the business activity of providing telecommunication services to consumers within this City shall include:

(A) all fees for connection to a telecommunication system.

(B) toll charges, charges for transmissions, and charges for other telecommunications services; provided that such charges relate to transmissions originating in the City and terminating in this State.

(C) fees charged for access to or subscription to or membership in a telecommunication system or network.

(D) charges for monitoring services relating to a security or burglar alarm system located within the City where such system transmits or receives signals or data over a communications channel.

. . . .

(c) *Interstate transmissions.* Charges by a provider of telecommunications services for transmissions originating in the City and terminating outside the State are exempt from the tax imposed by this section.

In October or November 1988, the city assigned an employee to research whether alarm monitoring companies were properly reporting their monitoring revenues. At that time the City of Phoenix's Tax and Licensing Division interpreted the telecommunications tax under new section 14–470 as exempting revenues earned through alarm system monitoring from central monitoring stations outside Arizona. The city was not aware of any out-of-state alarm monitoring services that began complying with the telecommunications tax voluntarily when the tax became effective.

The city gathered information from alarm monitoring services over a period of up to six months. The city's auditor called the alarm companies listed in the Phoenix Yellow Pages and asked each whether it had a central monitoring station located in Arizona or outside Arizona. Ten or fifteen companies stated they monitored security systems from outside Arizona. In accordance with its interpretation of Code section 14–470, the city did not seek to enforce compliance with the telecommunications tax by those companies at that time.

Sonitrol's central monitoring station was in Phoenix, Arizona. On July 7, 1989, the city began a telecommunications privilege license tax audit of Sonitrol. The audit covered the period from April 1987 through October of 1989. On December 21, 1989, the city notified Sonitrol that it was assessing it $40,-082.55 in unpaid taxes under section 14–470 for the audit period.

Sonitrol timely petitioned for a hearing on the assessment. Its petition asserted that section 14–470 exempted security alarm system monitoring businesses located outside Arizona from taxation, and that the section was therefore unconstitutional under the equal protection clause.

An administrative hearing was held on June 21, 1990, before a City of Phoenix hearing officer. At the commencement of the hearing the assistant city attorney representing the city stated in part as follows:

[T]he basic allegation in this protest is that this [taxing provision] ... discriminates against domestic or in-city monitoring businesses as opposed to foreign or out of the city monitoring businesses. When I say "out of the city," that is those in which the monitoring set up is outside of the city versus inside of the city. After reviewing the ordinance, I have advised the tax and licensing division, yet I also called Mr. Schafer yesterday afternoon so that this would not come as a surprise to him, that I felt that [the division's] position was erroneous.... [I]t's our position at this point ... that all of the businesses will be taxable and not just the ones in the City of Phoenix. The ... correct interpretation ... is that ... anyone who had a burglar alarm system within the City of Phoenix, we would not care whether the monitoring station was inside or outside of the City of

Phoenix. We would consider the gross revenue taxable under the section.

The city's tax and licensing division personnel suspended any efforts to recontact businesses which monitor security alarm systems in Phoenix from outside Arizona pending a ruling by the hearing officer on Sonitrol's protest.

The hearing officer issued his ruling on January 25, 1991. He agreed with the city's new interpretation of section 14–470 and held that Sonitrol's activities fell squarely within it. The hearing officer also stated:

> With respect to the out-of-state monitoring companies, the city has avowed to this tribunal that it will impose the tax at issue in this matter with respect to revenues received by those entities for monitoring systems located in Phoenix. Whether or not there is a constitutional interstate commerce defense which may be raised by the out-of-state monitoring companies need not be addressed here.[2] It is enough for purposes of this proceeding that the entire taxpayer class is being treated identically.[3]

Based on the hearing officer's ruling, the city issued an adjusted assessment in the amount of $42,753.84 on March 6, 1991. Pursuant to Phoenix City Code section 14–575, Sonitrol paid the entire adjusted assessment under protest, and timely filed a petition in the tax court for redetermination of the adjusted assessment.

The city moved for summary judgment. In response, Sonitrol argued that despite the city's changed interpretation of section 14–470, subsection (c) clearly exempted all security alarm monitoring companies whose monitoring stations were located outside Arizona. Sonitrol contended alternatively that if section 14–470(c) did not apply to security alarm monitoring companies, it would necessarily be unconstitutionally vague.

Sonitrol also offered evidence that the city had been attempting to contact out-of-state monitoring services concerning the telecommunications tax from February 11, 1991, through May of 1992, and as of May 1992 was auditing only one such company. Sonitrol contended that the city's failure to attempt to collect the telecommunications tax from out-of-state monitoring services before June 20, 1990, was intentional conduct that resulted in discrimination against in-state monitoring services. Sonitrol finally argued that it should be entitled to a refund on the ground that the applicable four-year limitations period, Phoenix City Code section 14–550, would likely preclude the city from collecting the tax from some out-of-state monitoring services, and in any event the city's actual efforts in pursuing out-of-state monitoring companies were "token in nature."

In response, the city argued that a taxpayer who complains that the administration of a tax violates its rights to be taxed uniformly with others in its class must demonstrate deliberate, purposeful discrimination in the application of the tax, and that Sonitrol had made no such showing. The city further contended that the only legal limitation on the city's ability to seek to collect taxes from out-of-state security alarm companies monitoring alarm systems in Phoenix was the four year limitations period provided by Phoenix City Code section 14–550.

After briefing and argument the tax court granted summary judgment for the city, stating:

> [T]he Court finds that the part of the Phoenix City Code attacked by plaintiff is clear: a burglar alarm system which transmits or receives signals over a communication channel and charges customers for the monitoring services it gives them must pay tax on the gross income derived from the monitoring services [Phoenix City Code section 14–470(a)(2)(D) ]. It must also pay

---

**2.** *See generally Quill Corp. v. North Dakota,* 504 U.S. 298, 309–18, 112 S.Ct. 1904, 1911–16, 119 L.Ed.2d 91 (1992).

**3.** The hearing officer also concluded that Sonitrol had had *no reasonable cause* for failing timely to pay the tax due for the months from April of 1987 through November of 1988, during

which time Sonitrol *was ignorant of the new tax.* The hearing officer further held Sonitrol's failure to timely pay between December of 1988 through March of 1989 was "due to the conversion of its record keeping and billing systems ..." and abated the penalty for that period of time. Sonitrol raises no issue on this appeal concerning penalties.

tax on any income it gets from merely transmitting signals over the communication system [Phoenix City Code section 14–470(a)(1)(A), (a)(2) ]. It does not, however, pay tax on signals transmitted to a place outside of Arizona [Phoenix City Code section 14–470(c) ].

Construed in this way, section 14–470 does not violate the equal protection clauses of the state or federal constitution, it does not allow for selective enforcement, and it does not exempt out-of-state monitoring services.

The fact that in June 1990, the city (through Ms. McGee) announced that from that day forward it would interpret the ordinance in the way stated above cannot have any effect on how the Court interprets the ordinance or whether the ordinance is a constitutional one.

The tax court entered judgment in accordance with its ruling on October 8, 1992. Sonitrol timely appealed. On April 26, 1993, midway between the filing of the answering and reply briefs in this court, the tax court filed an opinion pursuant to A.R.S. section 12–171. *Sonitrol of Maricopa County, Inc. v. City of Phoenix,* 174 Ariz. 570, 851 P.2d 869 (Tax Ct.1993).

### ANALYSIS OF CONTENTIONS

SONITROL'S MOTION FOR ORDER TO VACATE TRIAL COURT OPINION

■ During the pendency of this appeal Sonitrol filed a motion to vacate the tax court's opinion. Sonitrol argued that the opinion went beyond the tax court's jurisdiction to act in furtherance of the appeal, because it significantly differed from the final judgment, arguably misstated and misconstrued undisputed facts, altered Sonitrol's focus in its appeal, and might further complicate the appellate proceedings. In response the city agreed that the tax court lacked jurisdiction to issue an opinion after having signed a judgment. On initial consideration of the motion another panel of this court ordered it taken under advisement for dispo-

sition by the panel assigned to consider and decide the appeal on the merits.

It is true that in general the superior court loses jurisdiction while an appeal is pending except on matters in furtherance of the appeal. *Burkhardt v. Burkhardt,* 109 Ariz. 419, 510 P.2d 735 (1973). The obverse proposition is that "a trial court retains jurisdiction to act as long as that act cannot negate the decision in a pending appeal or frustrate the appeal process." *State v. O'Connor,* 171 Ariz. 19, 22, 827 P.2d 480, 483 (App.1992).

Sitting as the Arizona tax court, the superior court had in addition specific statutory authority to issue written opinions.[4] A.R.S. section 12–171 provides:

Decisions of the tax court which the court finds are of general public interest shall be published and distributed in the same manner as provided for the publication and distribution of the opinions of the supreme court.

Section 12–171 establishes no time limit for the filing of a tax court opinion. Further, a tax court opinion cannot affect the rights of the parties. It merely explains the reasoning on which the tax court previously ruled on the merits, and thus could neither negate our decision nor frustrate the appellate process. *See State v. O'Connor,* 171 Ariz. at 22, 827 P.2d at 483. The tax court did not exceed its jurisdiction in filing its opinion when it did.

■ Sonitrol contends the tax court's opinion "interjects new facts and issues which would materially alter the issues on appeal and would further complicate the appeal proceedings, which were based on the final judgment." Sonitrol asserts that the tax court's opinion stated that the city was only lax in enforcing the telecommunications tax from April 1, 1987, until late 1988, and that in 1988 the city mounted an effort to assess and collect the taxes it had not enforced for almost two years. Sonitrol assails these statements as contrary to the undisputed facts in the record. Sonitrol points out it was undisputed that as of February 11, 1991, the city

---

4. 1994 Ariz.Scss.Laws ch. 287, section 3 repealed A.R.S. section 12–171 effective July 17, 1994.

had not attempted to collect the telecommunications tax from any out-of-state monitoring services, and that as of May 1992 the city was engaged in auditing only one such service.

In our opinion Sonitrol's objections to the tax court's statements depend on a broader interpretation of those statements than their context truly allows. The tax court's opinion included these paragraphs:

The tax imposed by section 14–470 became effective on April 1, 1987. From that time until late 1988, the city was lax in its enforcement of section 14–470. This appears to have been due to negligent inaction and, as to the out-of-state businesses, the city's belief that the exemption in subsection (c) applied to any alarm system business with an out-of-state monitoring station.

**In late 1988, the city mounted an effort to assess and collect the section 14–470 taxes it had not enforced for almost two years. The city audited taxpayers' books and assessed taxes for their monitoring services.** The taxpayers appealed the assessments. As a result of that administrative appeal, the city determined that its previous interpretation of subsection (c) was wrong and on June 20, 1990, announced that the subsection (c) exemption only applies to charges for transmissions; charges for monitoring services are taxable whether a business's monitoring station is located inside or outside the state, and that has been the city's policy ever since.

**Since 1990, the city has made an effort to go back to the years 1987, 1988, and 1989 and assess taxes against those businesses with monitoring stations in- or out-of-state that monitor alarm services for Arizona customers. It has either contacted businesses with records outside the state by telephone or placed them on an audit plan.** As of May, 1992, the city had conducted four audits or desk reviews of businesses whose records are located outside the state and another audit was then in progress.

174 Ariz. at 573, 851 P.2d at 872 (emphasis added).

Contrary to the implication of Sonitrol's arguments, the tax court's statements did not imply that the city's commencement of active enforcement procedures in late 1988 encompassed all taxpayers it had failed to pursue previously. The tax court's clear focus was instead on the city's audits of Sonitrol itself, and of co-plaintiff CSG Security Services, Inc., which is not a party to this appeal. Additionally, the tax court's opinion details the actual extent of the city's auditing and assessing efforts from 1990 through May of 1992. The tax court's opinion does not misstate the record.

Sonitrol also urges that the tax court contradicted the undisputed facts in the record when it stated that "Sonitrol actually benefitted from the city's inaction from 1987 to 1989 because [Sonitrol] did not pay the tax...." 174 Ariz. at 573, 851 P.2d 869. We disagree. The context was:

This is not intentional and systematic discrimination against the taxpayers. The taxpayers actually benefitted from the city's inaction from 1987 to 1989 because they did not pay the tax. Once the city discarded its lethargy and settled upon what it believed to be a correct interpretation of section 14–470(c), it began an effort to recoup its losses; the taxpayers happen to be two of the businesses that benefitted from the lethargy and now, like all the others, must pay what is rightfully owing. If what the city did during 1987–1990 can be called discrimination, it is not the type of discrimination from which the taxpayers may benefit.

*Id.* The tax court's words make clear that the only benefit it attributed to Sonitrol was that of not being required to pay sooner rather than later. Contrary to Sonitrol's objection, the tax court did not imply that Sonitrol had escaped paying altogether.

We do not find that the tax court's opinion exceeds the scope of its judgment. It is plain from the matters filed in connection with the parties' cross-motions for summary judgment, the tax court's minute entry ruling, and its opinion, that the opinion merely amplifies and explains the reasoning it used in ruling for the City of Phoenix. That is

plainly within the legitimate scope of A.R.S. section 12–171. Sonitrol's motion to vacate trial court opinion is denied.

### INTERPRETATION OF PHOENIX CITY CODE SECTION 14–470(A) AND (C)

Sonitrol contends that Phoenix City Code section 14–470(a) and (c) exempts from taxation all monitoring service businesses whose central monitoring stations are located outside Arizona. Sonitrol asserts that this exemption violates the equal protection clauses of the United States and Arizona Constitutions.

Like the tax court, we reject Sonitrol's underlying premise. Correctly interpreted, section 14–470(c) does not apply to that portion of section 14–470(a) which taxes the gross income from the business of providing security alarm monitoring services.

Section 14–470(a) imposes a 2.7 percent tax on "the gross income from the business activity upon every person engaging or continuing in the business of providing telecommunication services to consumers within this City." Section 14–470(a)(1) lists six specific services using "communications channels" that are expressly included within the term "telecommunication services." Section 14–470(a)(2) additionally places four specific varieties of revenues within gross income taxable under subsection (a):

(A) all fees for connection to a telecommunication system.

(B) toll charges, charges for transmissions, and charges for other telecommunications services; provided that such charges relate to transmissions originating in the City and terminating in this State.

(C) fees charged for access to or subscription to or membership in a telecommunication system or network.

(D) charges for monitoring services relating to a security or burglar alarm system located within the City where such system transmits or receives signals or data over a communications channel.

These additions to gross income from "telecommunication services" include items that differ categorically from fees charged directly for "telecommunications services" as exemplified in section 14–470(a)(1)(A) through (F). For instance, telecommunication system connection and access fees and charges for security or burglar alarm system monitoring services over a communications channel in large part do not constitute direct compensation for any of the "telecommunication services" listed in section 14–470(a)(1)(A) through (F), but rather fees or charges for services or privileges necessarily involved with but peripheral to "telecommunication services." At the same time, section 14–470(a)(2)(B) makes explicit that certain direct charges for communications tolls, transmission charges and other charges for "telecommunication services" within section 14–470(a)(1) are also within gross income taxable under section 14–470.

It is against this backdrop that section 14–470(c) comes into play. That subsection, entitled "*Interstate Transmissions,*" provides: "[c]harges by a provider of telecommunication services for transmissions originating in the City and terminating outside the State are exempt from the tax imposed by this Section." Unlike Sonitrol, we interpret this as written: only "charges ... for transmissions" directed from Phoenix across state lines are exempt.

Section 14–470(a)(2)(D), under which the city assessed privilege taxes against Sonitrol, does not tax charges for transmissions of any kind. It taxes "charges for [security alarm system] monitoring services" which make use of a communications channel. The exemption provided by section 14–470(c) is therefore simply inapplicable in this case. As the tax court stated:

[T]he Court finds it unnecessary to decide whether the classification in section 14–470(c) is arbitrary or unreasonable because it does not apply to taxpayers. They misread that subsection. It states that "charges ... for transmissions" are exempt if the transmission originates in Phoenix and terminates outside Arizona. It does not mention charges for monitoring services, and "charges for transmissions" and "charges for monitoring services" are two separate and distinct items of "gross

income" under section 14–470(a)(2). If the city had intended subsection (c) to apply to monitoring services, it would have said so. Instead, the city specifically limited the exemption to "charges for transmissions."

. . . .

These taxpayers do not charge for the transmission of alarm signals. They charge for monitoring services and were taxed on the gross income received from those services. Taxpayers are correct that the subsection (c) exemption distinguishes between transmissions that terminate in state and those that terminate out of state. But only businesses that charge for transmissions have standing to challenge that classification.

174 Ariz. at 572–73, 851 P.2d at 871–72.

This interpretation fully accords with the evidence in this case. Galen Bucky, President of Sonitrol, testified before the city's hearing officer that Sonitrol charges its customers for providing an operator to respond to emergencies seven days a week, twenty-four hours a day. He testified that Sonitrol's telephone costs in connection with security alarm system monitoring services are part of its expenses of engaging in the monitoring business and are not directly charged to its customers. He further testified that each customer's monitoring services charges are periodic and fixed, regardless of whether the central monitoring station receives one call, ten calls or none. He stated he had never heard "of a charge in our industry being based on number of calls." Sonitrol nevertheless points out that section 14–470(a)(2)(B) taxes: "toll charges, charges for transmissions, and charges for other telecommunications services; **provided that such charges relate to transmissions originating in the city and terminating in this state.**" (emphasis added). Sonitrol argues that this proviso already accomplishes the exemption we attribute to section 14–470(c), and that our interpretation of that subsection would therefore render it superfluous. We disagree. Although there is plainly some overlap between subsection (c) and the proviso of section 14–470(a)(2)(B), we cannot agree that our interpretation of subsection (c) renders the two merely duplicative.

Subsection (a)(2)(A) through (D) all include within "gross income from . . . telecommunication services" fees and charges directly or indirectly related to the use of communications channels. The proviso in subsection (a)(2)(B) merely functions to delimit the addition to gross income accomplished by that subsection. Section 14–470(c) complements subsection (a)(2)(B), and solidifies the statutory intent, by expressly exempting charges for interstate transmissions originating in Phoenix.

We acknowledge the general principle that statutes should be construed to avoid rendering any portion meaningless or superfluous. *See Walker v. City of Scottsdale,* 163 Ariz. 206, 786 P.2d 1057 (App.1989). Where the language of the statute in question is clear on its face, however, there is no occasion for applying rules of construction. *Jenkins v. First Baptist Church of Scottsdale,* 166 Ariz. 243, 801 P.2d 478 (App.1990). As the tax court stated:

In interpreting a statute, the Court will first examine the language to be interpreted. If that language expresses a clear and unequivocal standard, the Court will interpret the statute accordingly. It will look no further for guidance. *Escalanti v. Superior Court,* 165 Ariz. 385, 388, 799 P.2d 5, 8 (App.1990); *Rio Rico Properties, Inc. v. Santa Cruz County,* 172 Ariz. 80, 89, 834 P.2d 166, 175 (Tax 1992). The language of section 14–470(c) is clear—charges for transmissions are exempt from the tax imposed by section 14–470 if the transmission originates in the City and terminates outside the State; charges for monitoring services are not exempt.

174 Ariz. at 572, 851 P.2d at 871.

Because we interpret the tax imposed by section 14–470(a)(2)(D) to apply to all charges for monitoring security alarm systems located within Phoenix, whether or not the affected taxpayer's central monitoring station is located within or outside Arizona, we need not consider Sonitrol's contention that section 14–470 violates the equal protection clauses of the United States and Arizona Constitutions on its face.

ACTUAL ENFORCEMENT OF SECTION 14–470(A)(2)(B) TO OUT-OF-STATE VERSUS IN-STATE MONITORING SERVICE REVENUES

Sonitrol argues in the alternative that the City violated its right to equal protection by deliberately restricting its efforts to enforce the section 14–470 telecommunications tax to in-state security alarm system monitoring services like Sonitrol until June of 1990, and thereafter failing to make "an earnest effort to correct the damage caused by its prior interpretation." We disagree.

From April 1, 1987, the effective date of section 14–470, until June 20, 1990, the city's tax and licensing division incorrectly interpreted subsection (c) to exempt from section 14–470(a)(2)(D) taxation those companies that monitored security systems within the City of Phoenix from outside Arizona. During that period, and until the issuance of the city hearing officer's ruling in this case in January 1991, the tax and licensing division acted in accordance with that incorrect interpretation by pursuing audits of in-state monitoring services only. Thereafter, the tax and licensing division began performing desk reviews and audits of out-of-state monitoring companies.

Contrary to Sonitrol's analysis, these circumstances do not give rise to a violation of its right to equal protection such that it is entitled to a refund of city telecommunication taxes it has paid. As we stated in *Tucson Mechanical Contracting, Inc. v. Arizona Department of Revenue,* 175 Ariz. 176, 854 P.2d 1162 (App.1992):

> To establish their claim that the department denied them equal protection, the taxpayers must show the department deliberately discriminated against them. *See Duhame v. State Tax Commission,* 65 Ariz. 268, 282, 179 P.2d 252, 261 (1947). In an analogous context, our supreme court has stated:
>
> > [B]efore a court will interfere, it must be clearly shown that assessments which are unequal are the result of systematic and intentional conduct—in the sense that the inequality would thereby be deliberately created....
>
> *Security Properties v. Arizona Department of Property Valuation,* 112 Ariz. 54,

57, 537 P.2d 924, 927 (1975); *accord McCluskey v. Sparks,* 80 Ariz. 15, 291 P.2d 791 (1955).

175 Ariz. at 181, 854 P.2d at 1167. In this case Sonitrol has fallen far short of demonstrating systematic, intentional discrimination on the part of the city.

Sonitrol's reliance on *Gosnell Development Corp. v. Arizona Department of Revenue,* 154 Ariz. 539, 744 P.2d 451 (App.1987) is misplaced. There, on remand from a prior appeal by a competitor of the taxpayer, the Department of Revenue acquiesced in an incorrect trial court ruling which had the effect of arbitrarily denying the benefits of the appellate court's ruling to some taxpayers but not others.

Unlike the situation in *Gosnell,* however, in the instant case the alleged unequal treatment of Sonitrol and its competitors is not a *fait accompli.* Phoenix City Code section 14–550 permits the Phoenix tax collector to assess additional taxes at any time within four years after a return is required to be filed or is in fact filed, whichever period expires later. Where no return at all is filed, the tax collector "may assess the amount of taxes payable for that month at any time." § 14–550(c). Although Sonitrol speculates that some out-of-state security alarm monitoring services actually filed returns in the months between April 1, 1987, and January of 1991, so that collecting additional taxes for unreported out-of-state monitoring service charges would be barred by the four-year limitations period, it makes no supporting reference to the record. For all this record reveals, all out-of-state monitoring companies are fully subject to audit and assessment by the City of Phoenix and will remain so.

Sonitrol's reliance on *County of Maricopa v. North Central Development Co.,* 115 Ariz. 540, 566 P.2d 688 (App.1977) is also misplaced. In a similar context, we distinguished *North Central Development Co.* as follows in *Tucson Mechanical Contracting, Inc. v. Arizona Dep't of Revenue:*

> In *North Central Development,* the court considered the effect of the Maricopa County Assessor's decision to assess only those partially completed buildings with

which deputy assessors were personally familiar, when faced with a direction to value and tax all partially completed buildings by the end of the year. The court found systematic, intentional discrimination that deliberately caused tax inequality. As a result of that discrimination, the Maricopa County Assessor failed to assess property taxes against a specific group of taxpayers and effectively changed those taxpayers' statutorily-established tax liability. *Id.* The court therefore granted relief to the taxpayers.

In contrast, this case involves not the valuation and assessment of property taxes imposed by an affirmative act of the government, but rather the department's audit and enforcement of self-assessed transaction privilege taxes. The difference between assessment and enforcement is critical. The department is obligated to value and assess all property in a like manner; the department is not statutorily charged with auditing and enforcing transaction privilege tax payments against all prospective taxpayers. *See Hibbs [v. Calcot, Ltd.],* 166 Ariz. [210] at 218, 801 P.2d [445] at 453 [ (App.1990) ] (tax authorities must be selective in using limited enforcement resources). Here the record indicates that the department lacked sufficient staff to verify self-assessed tax payments for all businesses covered by the transaction privilege tax system and therefore exercised its discretion to select some taxpayers for audit. "The fact that one taxpayer is subjected to an audit and assessment and that another might have been but was not, cannot establish a denial of equal protection absent a showing that the state's action was based upon an unjustifiable standard, such as race, religion or some other arbitrary classification." *Radiofone Corp. of New Jersey v. Director,* 4 N.J.Tax 420, 431 (NJ Tax Ct.1982) (citations omitted). 175 Ariz. at 182, 854 P.2d at 1168.

Here the city's failure to audit and assess out-of-state alarm monitoring services before January 1991 was due to its original incorrect interpretation of the reach of section 14–470(c). Failing to collect taxes because of "oversight or negligence or some similar conduct" does not amount to discrimination in violation of the equal protection clause. *Peo-*

*ple of Faith, Inc. v. Arizona Dep't of Revenue,* 171 Ariz. 140, 152, 829 P.2d 330, 342 (App.1992); *Gosnell Dev. Corp.,* 154 Ariz. at 541, 744 P.2d at 453.

As to the city's activities in auditing and collecting taxes from out-of-state alarm monitoring services after January of 1991, the record does not clearly reveal their extent or detail the reasons for which they were undertaken. Suffice it to say that, as in *Tucson Mechanical Contracting,* Sonitrol produced no evidence of a systematic policy of discrimination or inherently invidious audit selection standards. *See* 175 Ariz. at 182, 854 P.2d at 1168. The tax court did not err in rejecting Sonitrol's discriminatory enforcement claim.

Because we resolve Sonitrol's principal contentions as we do, we need not consider the question of appropriate remedy. Sonitrol requested attorneys' fees and costs on appeal and in the underlying matter. Since Sonitrol was not the prevailing party on appeal we decline to award it attorneys' fees and costs.

Affirmed.

VOSS and TOCI, JJ., concur.